# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 15-cv-1126 (RJS)

K.F., INDIVIDUALLY AND ON BEHALF OF A.F.,

Plaintiff,

VERSUS

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

OPINION AND ORDER
March 28, 2016

RICHARD J. SULLIVAN, District Judge:

Plaintiff K.F., individually and on behalf of her minor daughter, A.F., brings this action against Defendant New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"). Specifically, K.F. asserts that DOE failed to provide a fair and appropriate public education for A.F. and seeks reimbursement for the cost of her daughter's enrollment at Cooke Center Academy, where K.F. enrolled A.F. for the 2012–2013 school year unilaterally, i.e., without placement by DOE. Before the Court are the parties' cross motions for summary judgment. For the reasons that follow, Plaintiff's motion is DENIED, and Defendant's motion is GRANTED.

## I. BACKGROUND

### A. Statutory Framework

The IDEA requires states benefiting from federal funds to provide a "free appropriate public education" to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). Under the statute, a free appropriate public education ("FAPE") must offer "'special education and related services' tailored to meet the unique needs of a particular child" and "'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).

The special education and related services required by the IDEA are provided to students based on an individualized education program ("IEP"), which school districts must provide annually. 20 U.S.C. § 1414(d). The IEP is a written program of instruction that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988). An "IEP team" consisting of the child's parents, teachers, representatives of the local educational agency, and, where appropriate, the child, meets for the purpose of crafting the IEP. 20 U.S.C. § 1414(d)(1)(B). In New York State, this team is called the Committee on Special Education (the "Committee"), and a DOE representative serves as its leader. *See* N.Y. Educ. Law § 4402(1)(b)(1). To the extent the members of the Committee disagree, the DOE representative's determination prevails at this stage. *See M.H. v. N.Y.C Dep't of Educ.*, 712 F. Supp. 2d 125, 132–35 (S.D.N.Y. 2010). DOE's practice "is to provide general placement information in the IEP, such as the staffing ratio and related services, and then convey to the parents a final notice of recommendation . . . identifying a specific school at a later date. The parents are then able to visit the placement before deciding whether to accept it." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 191 (2d Cir. 2012).

The IDEA also establishes "procedural safeguards" to ensure that students with disabilities receive a FAPE. 20 U.S.C. § 1415(a). Specifically, the law requires states to provide parents with the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* § 1415(b)(6)(A). To adjudicate parents' complaints, New York has implemented a two-tiered system of administrative review. N.Y. Educ. Law § 4404. Under the first tier, parents dissatisfied with a proposed IEP may seek review by an impartial hearing officer. *Id.* § 4404(1). Following the decision of the hearing officer, an aggrieved party may appeal to a state review officer for an independent review. *Id.* § 4404(2). After exhausting this two-tiered administrative process, any party still aggrieved may bring a civil action challenging the state review officer's decision in federal or state court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

Additionally, pursuant to the IDEA's procedural safeguards, parents dissatisfied with an educational placement provided by a school district may unilaterally remove their child from a public school, place the child in a private school they believe to be appropriate to the child's needs, and file a complaint with DOE seeking reimbursement for the private school tuition. *See M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015). A school district must reimburse parents for unilaterally selected educational services if the parents can establish that: (1) the educational program recommended in the IEP was inappropriate to meet the child's needs; (2) the alternative placement or additional services selected by the parents were appropriate; and (3) equitable factors weigh in favor of reimbursement. *See C.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014). Parents seeking reimbursement for a unilateral private placement bear the burden of proving that it was appropriate. *Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005); N.Y. Educ. Law § 4404(1)(c). Thus, parents who believe that the state has failed to offer their child a FAPE act "at their financial risk" when choosing to unilaterally enroll their child in a private school. *Reyes v.*

*N.Y.C. Dep't of Educ.*, 760 F.3d 211, 215 (2d Cir. 2014).

B. Facts[1]

A.F., a student diagnosed with cerebral palsy and exhibiting cognitive abilities in the moderately delayed range, began ninth grade during the 2012–2013 school year. (JA 482–83, 607, 617.) From a young age, A.F. exhibited the symptoms of cerebral palsy, including difficulties with motor coordination and body alignment. (JA 291, 424, 482.) As a result, A.F. wore braces on both legs and another brace on her left wrist; she also required assistance with balancing and walking. (JA 291, 424, 577.) Academically, at the start of her ninth grade year, A.F. read at a first-grade level and performed on a second-grade level in math. (JA 603.) A.F.'s cognitive impairments also resulted in delayed language development as well as social and emotional challenges. (JA 424–26, 609.) A.F. attended public school special education classes from kindergarten to fifth grade. (JA 484.) Thereafter, her mother enrolled her at Cooke Center Academy ("Cooke Center"), a private specialized school for children with special needs. (*Id.*)

1. A.F.'s IEP and Placement

On February 16, 2012, the Committee convened to discuss A.F.'s progress and recommend an IEP for her upcoming 2012–2013 school year. (JA 270, 575–606.) Gavin Schneider, a general education and special education teacher, served as district representative for DOE and Committee leader; he appeared along with DOE psychologist Myriam Amber. (JA 267–70, 606.) K.F. also took part in the meeting, along with Cooke Center supervisor Michele Burns and Cooke Center teacher Rachel Munz. (JA 606.)

At the Committee meeting, the team discussed A.F.'s upcoming school year, referring to the educational progress report completed by educators at Cooke Center during the prior 2011–2012 academic year and the program established in the prior year's IEP. (JA 271–72.) The Cooke Center report reviewed A.F.'s academic performance levels as well as her physical and social needs, and it relayed progress reports from her related service providers. (JA 625–39.) Similarly, the IEP from the 2011–2012 school year included A.F.'s strengths and weaknesses in different areas of academic and emotional development. It also set forth goals for the academic year and recommended related services, including counseling, physical therapy, occupational therapy, and speech/language therapy. (JA 673–706.)

During the meeting, Schneider, K.F., and the Cooke Center representatives discussed a range of topics. K.F. reported that she had visited a public placement at 110 Chester Street in Brooklyn that she found to be inappropriate because it would have placed A.F. with lower-functioning classmates, some of whom had behavioral issues. (JA 607.) K.F. further expressed her desire to increase the frequency of A.F.'s related services. (*Id.*) Cooke Center staff also offered their views regarding A.F.'s needs for academic instruction and related services and

[1] The following facts are drawn principally from the parties' joint appendix, which was filed under seal. (Doc. No. 32 ("JA").) In deciding the parties' instant cross motions for summary judgment, the Court has also considered Plaintiff's memorandum of law in support of her motion for summary judgment (Doc. No. 33 ("Pl. Mem.")), Defendant's memorandum of law in support of its cross motion for summary judgment and in opposition to Plaintiff's motion for summary judgment (Doc. No. 39 ("Def. Mem.")), Plaintiff's reply (Doc. No. 37), and Defendant's reply (Doc. No. 40).

made suggestions for an appropriate placement. (JA 290–93, 610.)

At the conclusion of the meeting, after the parties had discussed A.F.'s needs, Schneider, on behalf of DOE, recommended a twelve-month placement in a 12:1:4 class – meaning twelve students, one special education teacher, and four paraprofessionals trained to address physical and emotional issues – in a specialized school. (JA 310–12, 598.) DOE also recommended several sessions each week in physical therapy, occupational therapy, speech/language therapy, and counseling. (JA 315, 598.)

Following the meeting, DOE memorialized these recommendations – including the related service programs and their frequencies (JA 598) – in the 2012–2013 IEP (JA 574–606), which was mailed to K.F. a few months after the meeting (JA 492–93). Although K.F. received a note at the Committee meeting directing her to contact DOE if she noticed any errors or omissions in the IEP document (JA 312-13, 640), K.F. did not respond with any corrections (JA 312).

On June 6, 2012, DOE issued a final recommendation notice offering A.F. a placement in a 12:1:4 class at New York City Public School P721K located at the Roy Campanella Occupational Training Center in Brooklyn ("P721K"). (JA 641.) The document further indicated that A.F. would receive a health paraprofessional in addition to related services in counseling, occupational therapy, physical therapy, and speech therapy. (*Id.*) More than two months later, K.F. responded to DOE in a letter dated August 16, 2015, noting that she had received DOE's final recommendation notice "too late to visit the recommended program [and] adequately assess its appropriateness." (JA 707.) In light of the need to care for A.F. following her recent spinal surgery, K.F. indicated that she planned to visit the recommended placement in September and in the interim intended to enroll A.F. at Cooke Center and seek reimbursement from DOE for the cost of tuition. (*Id.*)

A.F. spent the 2012–2013 school year at Cooke Center. (JA 504.) There, as a high school student, she traveled to different subject-specific classes within the Cooke Center facility with the assistance of a one-on-one paraprofessional, who helped her with walking and movement through the school and also provided positive reinforcement and prompting in the classroom. (JA 430–31, 438–39, 461.) Among the classes A.F. attended were an English language arts class that included twelve students, two teachers, and four paraprofessionals (JA 431), and a math class that included ten students, two teachers, and two paraprofessionals (JA 438–40). A.F. also received related services including physical therapy, occupational therapy, and speech therapy as part of the Cooke Center curriculum. (JA 712, 738, 765.)

In October 2012, K.F. visited P721K and viewed the proposed classroom. (JA 496–97.) On November 7, 2012, K.F. sent DOE a letter in which she expressed her view that the students in the DOE placement were not on the "same functioning level" as A.F., that students were not grouped with peers of the appropriate age, and that some students exhibited behavioral issues that would concern A.F. (JA 497–500, 709–11.) Additionally, K.F. stated that a P721K representative informed her that A.F. might be placed in a 12:1:1 class if it was determined that she was too high functioning for the 12:1:4 class indicated on her IEP. (JA 498, 709.) K.F. further noted that, based on her review of information about P721K through DOE's website, "a number of" students had not received the requisite speech, occupational, and physical therapy and counseling services during the 2011–

2012 school year, which caused K.F. "concern[] that [A.F.] would not get the related services that she requires" at the public placement. (JA 709; *see also* JA 502 ("I went to the DOE's website for the school, and I looked at the services for the prior school year and I noticed that not all of the kids received the services that they were supposed to so that had me concerned also.").) The letter concluded that A.F. would remain enrolled at Cooke Center and that K.F. would seek reimbursement for the cost of the private placement. (JA 710.)

On September 27, 2013, K.F. filed a due process complaint with DOE seeking reimbursement for A.F.'s Cooke Center tuition for the 2012–2013 school year as well as the costs of related services, special education transportation, and A.F.'s one-on-one paraprofessional. (JA 670.) Specifically, she alleged that (1) the Committee failed to consider sufficient evaluative information before recommending A.F.'s IEP, (2) K.F. was denied a meaningful opportunity to participate in the Committee meeting, (3) the IEP did not adequately reflect A.F.'s current performance levels, (4) the IEP's annual goals were inappropriate, (5) the IEP lacked sufficient provision for individual attention, transition supports, and a vocational assessment, (6) A.F.'s management needs recommendations were inappropriate, and (7) the recommended placement was inappropriate for A.F. (JA 664–71.)

2. The Hearing

The parties commenced a hearing before an impartial state officer (the "Hearing Officer") on May 12, 2014 (JA 243), in which the Hearing Officer received testimony from several individuals, including members of the Committee.

The hearing began with the testimony of Committee leader and DOE representative Schneider, who stated that he had reviewed a number of documents in advance of the Committee meeting, including A.F.'s November 2009 psychological evaluation (JA 611–18), November 2009 psychosocial evaluation (JA 619–22), February 2012 classroom observation (JA 623–24), 2011–2012 Cooke Center progress report prepared in November 2011 (JA 625–39), and IEPs from prior school years (*see, e.g.*, JA 673–706). (JA 272–73.) Schneider stated that the DOE psychologist, Myriam Amber, routinely confirmed that participants in Committee meetings had copies of the relevant documents available, and that he provided copies on request. (JA 274.) In addition, Schneider indicated that the Committee discussed A.F.'s academic and related services needs at length, amending goals from the prior year's IEP as necessary to account for the student's progress and identify areas requiring further attention. (JA 301–04; *see also* JA 608–10.) The process resulted in twenty-eight annual goals and short-term objectives, including goals targeted towards "living, working and learning as an adult," and A.F.'s "strengths, preferences and interests as they relate[d] to [her] transition from school to post-school activities." (JA 570–97.) DOE rested following Schneider's testimony (JA 417), despite the Hearing Officer's concern that DOE had not presented a witness to defend A.F.'s proposed placement at P721K (JA 366–68, 380).

To begin the parent's case, Cooke Center Assistant Head of School Mary Clancy took the stand. She described the environment and academic instruction at Cooke Center, including opportunities for small group or individual instruction and the ability to receive ongoing support from a one-on-one paraprofessional. (JA 426–44, 461.) Clancy further testified to her belief that A.F. required a departmentalized program in which students traveled to different classes in

a manner similar to a general education high school – instead of the more self-contained class setting recommended in A.F.'s IEP. (JA 463–64, 469–70; *see also* JA 492.) She further testified that A.F. had made progress in a number of areas during her ninth-grade year at Cooke Center. (JA 465–67.)

Finally, K.F. testified. She stated that she did not recall the Committee discussing documents other than the prior year's IEP during the meeting. (JA 486–89.) She further expressed concern regarding the proposed placement offered by DOE – expanding on the issues identified in her previously submitted letter to express that A.F. "is like a normal teenager" who "likes to talk on the phone and gossip and hang out" and that these activities would not be possible if A.F. were placed in the P721K special education 12:1:4 classroom with lower-functioning peers. (JA 499–500.) K.F. further testified that she did not "have a problem with [A.F.] going to public school," but she "didn't feel that the placement was appropriate for her." (JA 504.)

The Hearing Officer issued his written opinion on June 13, 2014 (JA 6–78), which he later revised on June 17, 2014 (JA 79–151). The opinion began by expressing the Hearing Officer's disagreement with DOE's practice of separately formulating and issuing its IEP before making a placement recommendation, a practice which he found resulted in an IEP "so sparse and limited that it fail[ed] utterly to describe an individually tailored program" for A.F. (JA 127.) As evidence of this point, the Hearing Officer pointed to the IEP's lack of specificity in its vocational recommendations, its failure to mandate a particular cognitive capacity for A.F.'s classmates, and its disregard for the implications of the student's emotional needs in the context of a large public school site. (*Id.*) The Hearing Officer also concluded that DOE failed to meet its burden of demonstrating that it had offered A.F. a free appropriate public education, or FAPE, for the 2012–2013 school year when it failed to present a witness at the hearing able to testify regarding the assigned public placement school. (JA 128–31.) In reaching this conclusion, the Hearing Officer reasoned that the due process complaint submitted by K.F. was "replete with explicit challenges" to the placement site, and that "dilatory production and transmission" of the final recommendation notice to the parent "rais[ed] an explicit need for witness testimony." (JA 129.) Finally, the Hearing Officer held that DOE denied A.F. a FAPE by "den[ying] . . . the family's right to participate meaningfully in the decisions made by the district" regarding the P721K public placement. (JA 130–31.)

After finding that DOE had not provided A.F. a FAPE, the Hearing Officer then examined the Cooke Center program to determine whether it was appropriate for A.F. and whether the equities favored K.F.'s reimbursement. The Hearing Officer found that Cooke Center's small group instruction and groupings of students at similar academic levels adequately met A.F.'s needs and allowed her to progress. (JA 132.) The Hearing Officer further found that the parent could not afford the cost of the child's placement and ordered DOE to provide K.F. with full reimbursement in the amount of $77,000. (JA 133, 800.)

3. State Review Officer Opinion

On October 15, 2015, a state review officer (the "Review Officer") issued an opinion reversing the Hearing Officer, concluding that DOE had offered A.F. a FAPE for her 2012–2013 school year and denying reimbursement. (JA 152–78.) At the outset, the Review Officer found that the Hearing Officer had "failed to address the bulk of the issues raised in the parent's due

process complaint notice," including claims regarding (1) the composition of the Committee, (2) the sufficiency of the evaluative material available to the Committee, (3) the Committee's consideration of evaluative material it possessed, (4) K.F.'s opportunity to participate in the Committee meeting, (5) the lack of vocational assessment in the IEP, (6) the substantive appropriateness of A.F.'s paraprofessional services recommendation, (7) the accuracy of the Committee's information regarding A.F.'s present performance levels, (8) the adequacy of the IEP's goals, (9) the appropriateness of the IEP's management objectives, and (10) the lack of promotional criteria and transition services in the IEP. (JA 161.) The Review Officer found the Hearing Officer's failure to address these issues to be particularly troubling in light of the fact that "the [Hearing Officer]'s decision spans 72 pages, but only 10 pages, at most, pertain to the issues specific to the student," while the bulk of the document "issued findings based upon disagreements with [the Hearing Officer's] perception of the district's broader policies," which did not appear in the due process complaint. (*Id.*)

Nevertheless, because the Review Officer determined that the record before it was "sufficient for a determination as to the issues the parent continue[d] to assert on appeal," the Review Officer "exercise[d] [his] discretion to retain th[e] appeal" (JA 162) and addressed the issues he found the Hearing Officer had failed to address. The Review Officer determined that K.F. had a meaningful opportunity to participate in the Committee process because she voiced her observations and concerns during the meeting and was not prevented from participating. (JA 162–64.) Additionally, while it was not clear whether K.F. had received copies of the relevant evaluative material that the Committee reviewed regarding A.F., this did not rise to a level of a denial of a FAPE. (JA 163.) The Review Officer further found that the Committee reviewed sufficient materials to develop an appropriate IEP for A.F. (JA 164–67.)

The Review Officer also concluded that the available evaluations provided the Committee with sufficient functional, developmental, and academic information to enable the team to create an appropriate IEP for A.F. and that the IEP did, in fact, reflect A.F.'s then-present levels of performance. (JA 167–70.) Additionally, the Review Officer found that the IEP recommended adequate supports for A.F.'s management needs. (JA 170–71.) The Review Officer further concluded that, while a vocational assessment should have been performed prior to the Committee meeting and its absence was a procedural violation, there was no "resultant harm" from the omission since the Committee was not required to develop transition services until the first IEP after A.F. turned fifteen years old. (JA 171.) Since A.F. was only fourteen years old at the start of the 2012–2013 school year, the obligation to provide transition services had not yet arisen.

Next, after reviewing each of K.F.'s substantive objections to the annual goals included in A.F.'s IEP, the Review Officer found that the goals were appropriate and sufficiently addressed A.F.'s needs. (JA 171–75.) Specifically, the Review Officer found that A.F.'s reading comprehension goals were adequate, that goals addressing self-regulation and focusing issues were included, that the goals provided sufficient performance metrics to measure progress, and that it was not improper for the IEP to repeat many of the prior year's goals. (*Id.*)

Finally, the Review Officer considered K.F.'s claim that the proposed placement, P721K, could not implement the IEP. (JA

175–77.) Because K.F. had not enrolled A.F. at P721K, the Review Officer found that K.F.'s claims regarding classroom composition and related service opportunities were speculative and thus did not amount to a violation. (*Id.*) Moreover, given the speculative nature of K.F.'s allegations, the Review Officer determined that DOE was not required to present a witness to defend the placement at the hearing. (JA 176–77.)

Accordingly, the Review Officer concluded that DOE had provided A.F. a FAPE and denied reimbursement without proceeding through the later steps of the Hearing Officer's analysis. (JA 177–78.)

### C. Procedural History

On February 17, 2015, K.F. filed a complaint in this Court seeking review of the Review Officer's decision. (Doc. No. 1.) She subsequently moved for summary judgment on June 26, 2015. (Doc. No. 21.) On July 24, 2015, Defendant cross-moved for summary judgment, arguing that the Review Officer correctly denied Plaintiff reimbursement. (Doc. No. 28.) The motions were fully submitted as of September 4, 2015. (Doc. No. 40.)

## II. Standard of Review

IDEA actions in federal court are frequently resolved on summary judgment motions. *J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). Unlike a typical motion for summary judgment, however, in an IDEA action, the existence of a disputed issue of fact will not defeat the motion. *A.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009). Rather, the district court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citation omitted).

This independent review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Instead, a district court "must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C.*, 553 F.3d at 171 (internal quotation marks and brackets omitted). The Court's review, therefore, "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *M.H.*, 685 F.3d at 244 (internal quotation marks and alterations omitted).

Where the Review Officer's decision conflicts with the earlier decision of the Hearing Officer, the Hearing Officer's decision "'may be afforded diminished weight.'" *A.C.*, 553 F.3d at 171 (quoting *Gagliardo*, 489 F.3d at 113 n.2). Furthermore, a district court must "'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer.'" *Id.* (quoting *Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984)). Deference is "particularly appropriate" where the state officers' "review has been thorough and careful." *Walczak*, 142 F.3d at 129.

## III. Discussion

"Two issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was 'reasonably

calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206–07). The Court will address K.F.'s challenges in each of these areas.

A. Procedural Review

The Second Circuit has emphasized that "[t]he initial procedural inquiry in an IDEA case is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C.*, 553 F.3d at 172 (citation and internal quotation marks omitted). However, not every "procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). Procedural errors render an IEP inadequate and deny a FAPE only if they have "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

Here, K.F. argues that the 2012–2013 IEP was procedurally deficient in that the Committee (1) failed to ensure that it had gathered and considered sufficient evaluative materials to craft A.F.'s IEP and (2) did not provide K.F. with a full and meaningful opportunity to participate in the Committee meeting. (Pl. Mem. at 24–28.) The Court will address each point below.

1. Sufficiency of Evaluative Materials

First, K.F. argues that the Committee failed to fully evaluate A.F. or consider sufficient evaluative material to justify its IEP recommendation. (Pl. Mem. at 24–26.) According to K.F., this omission, along with Schneider's failure to adequately consider materials and resources during the Committee meeting itself, resulted in the Committee having insufficient information to generate an adequate IEP for A.F. (Pl. Mem. at 25–26.)

After reviewing the administrative record, the Court finds that these challenges must fail. Specifically, the Court concludes that the materials available to Schneider constituted a sufficient basis from which to evaluate A.F.'s diagnoses and current condition. The prior year's IEP contained detailed information of A.F.'s proficiency levels in a number of subjects, as well as detailed goals and metrics for the 2012–2013 school year. (JA 675–76 (listing performance grade levels in decoding, listening comprehension, writing, and math), 684–98 (reflecting two goals in math, five for reading and writing, three in occupational therapy, four regarding speech and language, and six for physical therapy).) Furthermore, Cooke Center's progress reports supplemented the IEP with more up-to-date information recounting A.F.'s current abilities and including qualitative information from Cooke Center staff members regarding A.F.'s class progress, her interpersonal interactions, and her teachers' plans for future instruction. (*See, e.g.*, JA 625, 635.)

Additionally, A.F.'s 2009 psychological evaluation provided detailed information regarding her medical and psychological history as well as her current status. (JA 611 (medical history), 612–13 ("[A.F.] remained attentive and cooperative throughout the evaluation, putting forth appropriate effort. She was easily distracted, though, and required constant redirection."), 613–17 (setting forth testing results in detail), 617 (reflecting "mild mental retardation"

diagnosis), 617–18 (recommending that A.F. "continue with her current services" augmented by programs designed to foster social relationships with peers).) The 2009 psychosocial evaluation also discussed A.F.'s status, noting that she is ambulatory and able to care for her basic personal hygiene. (JA 621.) That evaluation recommended that A.F. continue her current program and receive appropriate community services to allow her to further develop her skills. (JA 622.) Finally, a classroom observation conducted just prior to the Committee meeting noted that A.F. was friendly to others, engaged in the lesson, and able to read an essay she had authored aloud to the class with the help of her paraprofessional (JA 624), though at one point A.F. needed to be reminded to raise her hand in class (JA 623).

However, K.F. correctly contends (Pl. Mem. at 25) that the Committee should have supplemented the existing materials with, at least, a functional vocational assessment prior to the Committee meeting under state regulations. *See* 8 N.Y.C.R.R. § 200.4(b)(6)(viii) (requiring that students of A.F.'s age receive an assessment to determine vocational skills, aptitudes, and interests). DOE's failure to demonstrate that a vocational assessment was completed prior to the Committee meeting is a procedural violation.

The Court must assess, however, whether the violation rendered the IEP as a whole inadequate and resulted in a denial of a FAPE. *See Karl*, 736 F.2d at 877. Here, K.F. has not alleged any resulting harm from the omission, and as the Review Officer noted (JA 171), the Committee was not required to develop transition services – to be based on a vocational assessment – until the first IEP following A.F.'s fifteenth birthday. *See* 8 N.Y.C.R.R. § 200.4(d)(2)(ix). Prior to that date, the decision of whether to include transition supports rested within the Committee's discretion. *Id.* In light of the facts that A.F. was only fourteen years old at the time of the IEP meeting (JA 483), and that the IEP's goals identified her "transition needs" (JA 579), the Court finds that the procedural error did not deny A.F. a FAPE. *See M.M. v. N.Y.C. Dep't of Educ.*, No. 14-cv-1542 (GBD), 2015 WL 1267910, at *6–7 (S.D.N.Y. Mar. 17, 2015) (lack of a vocational assessment did not deny a FAPE where "the IEP contained annual goals and services related to academics and post-secondary transition" and plaintiff received notice of the proposed placement).

Finally, the record indicates that the Committee referred to the materials discussed above when formulating A.F.'s 2012–2013 IEP. Schneider testified that he considered a number of sources, including the prior year's IEP, the Cooke Center progress reports, the psychological evaluation, the psychosocial evaluation, and the classroom evaluation prior to developing A.F.'s IEP. (JA 272–74.) Additionally, K.F. testified that the Committee sought input from the Cooke Center representatives regarding A.F.'s progress. (*See* JA 489–92.) The hearing exhibits, including the meeting minutes, support this testimony. (JA 607–10.) Accordingly, the Court finds that the evaluative materials Schneider and the Committee considered were sufficient to create A.F.'s 2012–2013 IEP and to provide a procedurally adequate FAPE.

2. Parent's Opportunity to Participate

K.F. also alleges that she was denied a meaningful opportunity to participate in the preparation of A.F.'s IEP because (1) the Committee failed to afford K.F. and the Cooke Center representatives a meaningful opportunity to contribute during the meeting and (2) she was not meaningfully consulted regarding the recommendation of a 12:1:4

special education class in a specialized school. (Pl. Mem. at 26–28.) The Court disagrees.

K.F. attended the Committee meeting, along with two representatives from Cooke Center – one in person for the entirety of the meeting and another via phone for a shorter period. (JA 606.) During the meeting, K.F. and the Cooke Center representatives provided information regarding A.F.'s current status and otherwise assisted in crafting A.F.'s IEP. (JA 270–73, 289–90, 606.) The meeting minutes note A.F.'s concerns with a 12:1:4 program she visited at 110 Chester Street in Brooklyn (JA 607 ("Mom said that she did not think that the program was appropriate b/c children were lower functioning than [A.F.] and some of them had behavioral issues."), and that a 12:1:1 program "was considered and rejected at this time until parent has seen another program" (*id.*). Clearly, the law does not require the Committee to ensure that K.F. spoke on every point or to defer to her view regarding the proper class size and peer group for A.F. The IDEA's procedural requirements mandate only a parent's opportunity to participate, "not that the parent have the final word." *A.M. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 280 (S.D.N.Y. 2013). Here, after fully reviewing the record, the Court agrees with the Review Officer's thorough analysis and finds that the IEP complied with the procedural requirements of the IDEA. Accordingly, the Court finds that neither of the alleged procedural deficiencies, whether considered individually or collectively, deprived A.F. of a FAPE.

B. Substantive Review

The IDEA requires school districts to provide each disabled student with an IEP "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. This standard, however, does not require the school district to "'maximize the potential of handicapped children.'" *Walczak*, 142 F.3d at 130 (quoting *Rowley*, 458 U.S. at 199). Rather, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity [for] greater than mere trivial advancement." *Cerra v. Pawling Centr. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (internal citation and quotation marks omitted). The statute requires only an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (citation omitted).

The Second Circuit has made clear that, "[i]n determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision." *R.E.*, 694 F.3d at 187. "[A]n IEP must be evaluated prospectively as of the time it was created. Retrospective evidence that materially alters the IEP is not permissible." *Id.* at 188. Moreover, on questions of an IEP's substantive adequacy, "substantial deference is owed to the judgments of state administrative officers." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015); *see also Cerra*, 427 F.3d at 195 ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy.").

K.F. argues that the IEP and P721K placement were substantively inadequate to provide A.F. with a FAPE. Specifically, she asserts that (1) the IEP did not reflect A.F.'s current performance levels or appropriately address her needs, (2) the IEP's annual goals and transition supports were vague and inadequate, (3) the 12:1:4 program

recommendation was insufficient to address A.F.'s academic and emotional needs, and (4) the P721K placement was inappropriate for A.F. (Pl. Mem. at 12–24, 28–30.) The Court will address each of these arguments in turn.

1. IEP's Current Performance Levels

K.F. argues that the IEP did not adequately identify A.F.'s present levels of performance or address her specific needs. (Pl. Mem. at 28–29.) Specifically, K.F. asserts that (1) the IEP omitted a description of A.F.'s reading comprehension abilities and reading comprehension goals; (2) the IEP failed to reflect A.F.'s diagnoses of cerebral palsy and mental retardation; (3) the IEP did not document A.F.'s management needs, the severity of her academic and social issues, or the individual attention that she required; and (4) the IEP failed to describe A.F.'s physical capabilities and physical therapy and occupational therapy levels. (*Id.*) The Court disagrees.

Contrary to K.F.'s assertions, testimony before the Hearing Officer indicates that the Committee considered A.F.'s present levels of performance through both the documents it reviewed and the verbal input of K.F. and the Cooke Center representatives at the meeting. (JA 270–73, 289–90, 301, 333, 606.) Specifically, the IEP discussed A.F.'s reading skills (*see* JA 575, 603) and included no less than five goals targeting A.F.'s reading and writing (*see* JA 583–87). The IEP further noted that A.F. suffered from "multiple disabilities," identified her grade levels in academic subjects, and discussed her physical therapy and occupational therapy exercises. (JA 575, 590–96, 603.) While the IEP did not mention A.F.'s diagnosis by name for privacy reasons, her diagnosis was listed in a confidential file that would have been available to school staff with access to the IEP (JA 291), and the information in the IEP itself conveyed the substance of A.F.'s disabilities (JA 292). Accordingly, based on a thorough review of A.F.'s IEP, the Court concludes that it adequately reflected A.F.'s then-current performance, her diagnoses, and the nature of her disabilities.

2. Annual Goals and Transition Supports

K.F. further alleges that the goals included in A.F.'s IEP were inappropriate and insufficient to meet her needs. (Pl. Mem. at 29.) Specifically, K.F. points to the failure to include goals focused on A.F.'s attention and self-regulation issues and asserts that the goals that did appear in the IEP failed to include proper baselines against which to measure A.F.'s progress. (Pl. Mem. at 30.)

An IEP must contain goals for each student along with evaluative procedures for measuring the student's progress towards those articulated goals. 20 U.S.C. § 1414 (d)(1)(A)(i)(III); 34 C.F.R. § 300.320(a)(2)-(3); 8 N.Y.C.R.R. § 200.4(d)(2)(iii). Here, the IEP contained twenty-eight goals addressing subjects including math, reading, writing, physical therapy, occupational therapy, and counseling/coping skills. (JA 301–04, 579–97.) The goals were specific, requiring for example that A.F. "demonstrate comprehension of the vocabulary and recognition of coins (penny, nickel, dime, quarter) and then demonstrate the ability to manipulate the money i.e. make values from different coins &/or bills, make change." (JA 588.) Furthermore, each of these goals included detailed recommendations for measurements to determine if A.F. had met the goal, who should take the measurements, and when progress should be measured. (JA 579–97.) For example, A.F. was to name and manipulate coins "during 2 activities with 90% accuracy" as evaluated by her teacher every four weeks. (JA 588.)

K.F. argues that a lack of a baseline from which to measure A.F.'s progress with each annual goal is fatal to the IEP (Pl. Mem. at 29–30), but K.F. does not cite a case for this proposition, nor has the Court's independent search uncovered one. Indeed, this lack of authority is fully consistent with the structure of A.F.'s goals, because a "baseline" is not relevant to whether a child completes an activity with 90% accuracy on two occasions. *See R.B. v. N.Y.C. Dep't of Educ.*, 15 F. Supp. 3d 421, 434 (S.D.N.Y. 2014) (rejecting a plaintiff's objection to goals that "contain no 'baseline levels of functioning'" since "the goals [in the IEP] are stated in absolute terms and can be measured without reference to a baseline"). Here, in light of the large number of goals articulated in the IEP, their specificity, and the inclusion of a metric upon which to measure A.F.'s progress, the Court must defer to the Review Officer's well-reasoned conclusion that these goals are adequate to provide A.F. with a FAPE. *See Grim*, 346 F.3d at 381 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.").

Additionally, K.F. claims that the lack of support services in the IEP specific to A.F.'s transition to a new school denied A.F. a FAPE. (Pl. Mem. at 30.) To begin with, while in some cases the IDEA may require such services due to a student's particular needs, there is no blanket requirement in the IDEA "'for a 'transition plan' when a student moves from one school to another,'" *A.D. & M.D. ex rel. E.D. v. N.Y.C. Dep't of Educ.*, 12-cv-2673 (RA), 2013 WL 1155570, at *8 (S.D.N.Y. Mar. 19, 2013) (quoting *E.Z.-L ex. rel. R.L. v. N.Y.C. Dep't of Educ.*, 763 F. Supp. 2d 584, 598 (S.D.N.Y. 2011)), and K.F. points to no evidence indicating A.F.'s need for specific services to support her transition between schools. In any event, the IEP provided for counseling (JA 579–80), which likely would have been supplemented with guidance from A.F.'s teacher (JA 360–61), and K.F. does not explain what school-to-school transition services beyond these were required. Accordingly, the Court concludes that the absence of such transition services did not deny A.F. a FAPE. *See F.B. v. N.Y.C. Dep't of Educ.*, No. 14-cv-3902 (PAE), 2015 WL 5564446, at *21 (IEP provided a FAPE where, though it omitted transitional services, the IEP otherwise provided services that would assist in the child's transition); *A.D. & M.D. ex rel. E.D. v. N.Y.C. Dep't of Educ.*, 12-cv-2673 (RA), 2013 WL 1155570, at *8 (S.D.N.Y. Mar. 19, 2013) ("a more comprehensive transition plan" was not required where the IEP "provide[d] services to address the Student's difficulty transitioning").

3. The 12:1:4 Program Recommendation

K.F. maintains that DOE's 12:1:4 special education class in a specialized school was unduly restrictive since "a full-time self-contained program with minimal opportunities for social interaction and no opportunities to switch classes and further [A.F.'s] executive functioning ability was a step back for A.F." (Pl. Mem. at 30.) Here, although K.F. and Cooke Center urged a contrary result, the record clearly demonstrates that the Committee relied on its expertise, comments made at the Committee meeting by both K.F. and the Cooke Center representatives, and the documents available to the Committee in advance of the meeting to recommend a 12:1:4 special education classroom in a specialized school for A.F.

The hearing testimony (JA 273–74) demonstrates that the Committee reviewed A.F.'s academic, social, and physical progress as reflected in the prior year's IEP, psychological and psychosocial evaluations, and the Cooke Center report. (*See* JA 607–22, 625–39.) These documents indicated that

A.F. required substantial supports when moving around the school building and adaptive supports for use in the classroom. (*See* JA 680 (describing A.F.'s use of an adaptive chair as well as her present health status and physical development as part of the 2011–2012 IEP).) Additionally, A.F.'s required academic instruction was crafted in a manner consistent with her first-grade reading level and second-grade mathematics skills. (*See* JA 675 (noting A.F.'s performance in the 2011–2012 IEP).) At this level of functionality, Committee leader Schneider – an experienced professional with substantial knowledge regarding special education programs (JA 261–62) – and the DOE psychologist believed that a 12:1:4 program was the proper placement for A.F. (JA 598, 607.) Moreover, Schneider testified that a 12:1:4 class was designed for students like A.F. who "need more adult supervision" than that provided in a 12:1:1 program and that a "12:1:4 [program] plus an additional para[professional] for [A.F.] would . . . almost guarantee[] that [A.F.] would have the support that she needed to make advancement." (JA 314.) Though the Committee had considered recommending a 12:1:1 program, it decided that such a recommendation would be inappropriate for the 2012–2013 school year since K.F. advised that she had not yet had an opportunity to investigate a 12:1:1 option. (JA 607.)

To be sure, the Cooke Center representative who attended the Committee meeting in person disagreed with the IEP's program recommendation. She later testified that she was familiar with 12:1:4 programs and believed that a program of that type would not meet A.F.'s needs. (JA 469–71.) She further testified that A.F. required additional teacher support and that a fully contained program like the one recommended by the Committee was not appropriate for A.F.'s social development. (JA 470.) Nevertheless, the law is clear that "[i]t is not for the federal court to 'ch[oose] between the views of conflicting experts' on such questions." *R.E.*, 694 F.3d at 189 (citation omitted). In light of the deference owed to the state authorities and after a thorough review of the record, the Court concludes that the 12:1:4 program selected by the Committee was likely to produce progress and "reasonably calculated to enable [A.F.] to receive educational benefits." *Rowley*, 458 U.S. at 207.

4. Placement at P721K

K.F. next argues that DOE failed to establish that P721K could implement the requirements of A.F.'s IEP. (Pl. Mem. at 12–23.) Specifically, K.F. contends that the facts regarding P721K's deficiencies were not "speculative" and, therefore, obligated DOE to at least present a placement witness at the hearing to testify regarding the school's ability to meet A.F.'s needs as articulated in her IEP. (*Id.*)

The Second Circuit has clearly held that "challenges to a school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation." *M.O.*, 793 F.3d at 244 (quoting *R.E.*, 694 F.3d at 195). Thus, while the school district does not have "carte blanche" to assign a placement "that cannot satisfy the IEP's requirements," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009), "[s]peculation that a school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement," *R.E.*, 694 F.3d at 195.

Of course, this prohibition against speculation regarding an IEP's implementation "does not foreclose *all*

prospective challenges to a child's proposed placement school." *M.O.*, 793 F.3d at 244. As the Second Circuit recently explained:

> While it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP. For example, it is not speculative to conclude that an IEP recommending a seafood-free environment, for a child with a life threatening seafood allergy, could not be implemented at a proposed school that was not seafood free. Nor is it speculative to conclude that an IEP recommending one-on-one occupational therapy, outside of the classroom, could not be implemented at a school that provided only in-class occupational therapy in a group setting.

*Id.* (citations omitted). Accordingly, the Court must examine whether K.F.'s assertions regarding the P721K placement fairly implicated the school's capacity to provide A.F.'s IEP-mandated services and thus "trigger[ed] a duty on the part of the school district to provide evidence regarding [P721K's] adequacy." *Id.* at 245.

In her November 2012 letter to DOE and in her testimony before the Hearing Officer, K.F. asserted several reasons for her rejection of the proposed placement. For example, she alleged that the students at P721K were not on the "same functioning level" as A.F., that students there were not grouped with peers of the appropriate age, and that some students exhibited behavioral issues that would concern A.F. (JA 497–500, 709–10.) K.F. further noted that a P721K representative informed her that A.F. might be placed in a 12:1:1 class if it was determined that she was too high functioning for the 12:1:4 class indicated on her IEP. (*Id.*) K.F. also asserted that the DOE website showed that "not all of" the students at P721K had received their prescribed related services during the 2011–2012 school year. (JA 502, 709.) K.F. testified that A.F. "is like a normal teenager" who "likes to talk on the phone and gossip and hang out," which would not have been possible in the P721K special education 12:1:4 classroom. (JA 499–500.)

However, these concerns speak only speculatively to P721K's capacity to implement A.F.'s IEP. First, Plaintiff does not establish that the students operating at a different functional level or exhibiting behavioral issues would have been grouped with A.F. in the upcoming year, nor does she establish that such a grouping would contravene A.F.'s IEP. *See Y.F. v. N.Y.C. Dep't of Educ.*, No. 15-cv-6322 (LGS), 2015 WL 4622500 at *7 (S.D.N.Y. July 31, 2015) (rejecting arguments "ranging from [the placement's] size, to its curriculum, to its environment" as "not contrary to any specific requirement in the IEP"); *H.C. v. N.Y.C. Dep't of Educ.*, 14-cv-1927 (AKH), 2015 WL 1782742 at *4 (S.D.N.Y. April 9, 2015) ("[T]he law does not require that students be grouped with others of identical academic abilities.").

Second, K.F.'s vague assertion that A.F. might not receive her related services because "not all" students from the prior school year had received theirs did not trigger an obligation on the part of DOE to present evidence in defense of P721K. In *R.E.*, the Second Circuit rejected a nearly identical argument, holding that plaintiffs' assertion that DOE's "own internal documents show[ed] that a large percentage of students at [the proposed placement] ha[d] been and

continue[d] to be 'underserved' for related services" amounted to "[s]peculation that the school district w[ould] not adequately adhere to the IEP," which "is not an appropriate basis for unilateral placement." *R.E.*, 694 F.3d at 195 (citation omitted). As the Second Circuit emphasized, "[a] suggestion that some students are underserved cannot overcome the 'particularly important' deference that [courts] afford the [state review officer]'s assessment of the plan's substantive adequacy." *Id.* (quoting *Cerra*, 427 F.3d at 195)); *see also Y.F.*, 2015 WL 4622500, at *6 ("[T]he fact that the placement had not always delivered all required special education services to its students does not establish that the placement could not provide the required services to [the student]."). For the same reasons, K.F.'s assertion that a representative from P721K told her that A.F. might be moved to a different classroom also falls short. *See J.D. v. N.Y.C. Dep't of Educ.*, No. 14-cv-9424 (ER), 2015 WL 7288647, at *16 (S.D.N.Y. Nov. 17, 2015) ("Plaintiff's own testimony that [placement] officials made comments to her indicating an inability to effectively serve [the student] do not come close to proving that the school was 'factually incapable' of implementing the IEP, and was thus properly excluded from consideration by the [state review officer].").

Finally, K.F.'s personal belief that A.F. would not have received opportunities for social interaction at P721K does not speak to P721K's ability to implement A.F.'s IEP and is, in any event, wholly speculative. *See M.O.*, 793 F.3d at 245 ("[A]lthough [the parent] testified that she visited [the proposed placement] and found that the placement was inappropriate, her assertion was based on her own belief that 'if [the student] was put in there[,] he would shut down completely,' rather than on [the proposed placement's] lack of IEP-mandated services." (citation omitted)).

Accordingly, based on a thorough review of the record before it, the Court finds that K.F.'s complaints were speculative, and thus "the school district did not have the burden to produce evidence demonstrating [the placement's] adequacy in response to these arguments." *Id.* A different conclusion would disregard "the 'particularly important' deference that [courts] afford the [state review officer]'s assessment of the plan's substantive adequacy." *R.E.*, 694 F.3d at 195.

After a complete review of the record in this matter, the Court agrees with the Review Officer and finds that DOE provided A.F. with an IEP "reasonably calculated to enable the child to receive educational benefits" for her 2012–2013 school year. *Rowley*, 458 U.S. at 207.

C. Reimbursement Inquiry

The parties make further arguments as to whether A.F.'s placement at Cooke Center met her educational needs and whether the equities support K.F.'s claim for reimbursement. Because the Court finds that DOE provided A.F. with an IEP that both "complied with the procedural requirements of the IDEA" and was "'reasonably calculated to enable the child to receive educational benefits'" for the 2012–2013 school year, *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206–07), the Court does not address the further hurdles that stand between Plaintiff and reimbursement. *See generally D.B. v. N.Y.C. Dep't of Educ.*, No. 10-cv-6183 (RWS), 2011 WL 4916435, at *12 (S.D.N.Y. Oct. 12, 2011) (finding that a reviewing court need

not reach the final factors of reimbursement analysis where it finds an IEP procedurally and substantively adequate).

## IV. Conclusion

A review of the record in this matter reveals that A.F. is blessed with a loving parent who has her daughter's best interests at heart. And the Court recognizes that K.F. is, in a very real sense, the person most qualified to assess the educational options available to A.F. Nevertheless, the IDEA does not require deference to parents' assessments, however well-intentioned, and it limits the inquiry of a reviewing court to rather minimal requirements. "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity [for] greater than mere trivial advancement." *Cerra*, 427 F.3d at 195 (citation and internal quotation marks omitted). That is a modest goal, and one that undoubtedly falls short of what a devoted parent would hope to provide for her child, but it is all that the law requires. After a careful analysis of the record before it, the Court finds that DOE has met that standard here.

For the reasons stated above, the Court finds that (1) DOE complied with the procedural requirements of the IDEA and (2) the 2012–2013 IEP was reasonably calculated to enable A.F. to receive educational benefits. Accordingly, Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED. The Clerk of the Court is respectfully directed to terminate the motions located at docket numbers 21 and 28, and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 28, 2016
New York, New York

* * *

Plaintiff K.F. and her minor child A.F. are represented by Lauren A. Baum and Kira I. Epstein of the Law Offices of Lauren A. Baum, P.C., 61 Broadway, Suite 1060, New York, New York 10006.

Defendant New York City Department of Education is represented by Lyssa M. Sampson and Lesley Berson Mbaye of New York City Law Department, 100 Church Street, New York, New York 10007.